# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| ORCHARD HILL BUILDING COMPANY, | |
| Plaintiffs, | Case No. 15-cv-06344 |
| v. | Judge John Robert Blakey |
| UNITED STATES ARMY CORPS OF ENGINEERS, | |
| Defendants. | |

## MEMORANDUM OPINION AND ORDER

This case is before the Court on cross motions for summary judgment. For the reasons explained below, the Court denies Plaintiff's motion for summary judgment [40] and grants Defendant's motion [55]. The Court also denies Plaintiff's motion to strike [32].

## I.    FACTUAL BACKGROUND

Orchard Hill Building Company, d.b.a. Gallagher & Henry ("G&H"), acquired title to a 100-acre parcel of property (referred to as the "Warmke Parcel") in 1995 for the purpose of developing residential housing. Soon thereafter, the Village of Tinley Park executed an annexation agreement and passed a zoning ordinance allowing G&H to develop the entire Warmke Parcel. Record [30] at 65.

The Warmke Parcel was divided into three sections. Twenty-five acres on the southern portion of the property were to be developed as a 168-unit townhome neighborhood. Sixty-one acres on the northern portion were to be developed as a

169-unit single-family neighborhood. The remaining section, situated between the townhome community to the south and the single-family community to the north, was designed to function as a storm water detention area to serve the two neighborhoods. The water detention area was to be constructed concurrent with the development of the townhomes on the southern portion of the property. *Id.*

The entire development was scheduled to take place in two phases. *Id.* at 66. The townhomes, storm water detention area, and sewer and water infrastructure necessary to serve both neighborhoods were to be constructed during Phase I. After Phase I was developed and the townhomes substantially sold, Phase II was scheduled to commence, during which the 169 single-family homes were scheduled to be built. *Id.*

G&H began Phase I construction in early 1996, and the first sales of townhomes took place in 1997. From 1998 until 2005, 132 townhomes were built and sold at a rate of 16.5 per year. *Id.* The development plan was on target to begin construction of the Phase II single-family homes as scheduled, but the plan abruptly halted on November 17, 2006, when the United States Army Corps of Engineers designated approximately 13 acres of the undeveloped property as "wetlands" and asserted jurisdiction to regulate them.[1] *Id.* at 67.

The wetlands in question are on the northern portion of the property, the section designated for Phase II development. They drain south through a ditch into

[1] Wetlands are defined as "areas that are inundated or saturated by surface or ground water at a frequency and duration sufficient to support, and that under normal circumstances do support, a prevalence of vegetation typically adapted for life in saturated soil conditions." 33 C.F.R. § 328.3(b).

an open water detention pond and then east into another open pond. From there, they flow north via storm sewer pipe into a third open water pond, and then into Midlothian Creek, a stream that flows directly to the Little Calumet River, a traditional navigable water. Record [30] at 16, 19, 24. The wetlands had been converted to farming operations prior to December 23, 1985, but farming stopped in 1996 and has not resumed. Wetland conditions returned sometime thereafter. *Id.* at 14.

II.    RELEVANT STATUTORY AND REGULATORY PROVISIONS

   A.    The Clean Water Act

The Corps asserted jurisdiction pursuant to the Clean Water Act ("CWA"), which prohibits discharging any "pollutant" into "navigable waters" without a permit. 33 U.S.C. §§ 1311(a), 1362(12). "Navigable waters" are defined in the CWA as "waters of the United States." 33 U.S.C. § 1362(7). Although the phrase "waters of the United States" is not defined in the statute, it is defined in the regulations promulgated by the Corps pursuant to the CWA.

The Corps' regulations define "waters of the United States" in seven categories: (1) traditional navigable waters; (2) interstate waters; (3) other waters, the use, degradation, or destruction of which could affect interstate commerce; (4) impoundments of jurisdictional waters; (5) tributaries of waters identified in (1) through (4); (6) the territorial seas; and (7) wetlands adjacent to waters identified in (1) through (6). 33 C.F.R. § 328.3(a)(1)-(7) (1987).

In *Rapanos v. United States*, the Supreme Court reviewed this regulatory definition of waters of the United States as it applied to wetlands. 547 U.S. 715 (2006). In a plurality opinion authored by Justice Scalia, the Court adopted the "relatively permanent" standard, holding that "waters of the United States" includes "relatively permanent, standing or continuously flowing bodies of water" that are connected to traditional navigable waters. As the Seventh Circuit noted *United States v. Gerke Excavating, Inc.*, 464 F.3d 723 (7th Cir. 2006), however, the Court could not agree on the scope of federal authority over wetlands. Justice Scalia believed that wetlands fell within the scope of the CWA only when the Army Corps of Engineers could show: "first, that the adjacent channel contains a 'water of the United States' (i.e., a relatively permanent body of water connected to traditional interstate navigable waters); and second, that the wetland has a continuous surface connection with that water, making it difficult to determine where the 'water' ends and the 'wetland' begins. 547 U.S. at 742. Justice Kennedy, in a concurring opinion, wrote that the Corps' jurisdiction over wetlands "depends upon the existence of a significant nexus between the wetlands in question and the navigable waters in the tradition sense." *Id.* at 779. For a nexus to be "significant" in this context, the wetlands must "either alone or in combination with similarly situated lands in the region significantly affect the chemical, physical, and biological integrity of other covered waters more readily understood as 'navigable.'" *Id.* at 780. In *Gerke*, the Seventh Circuit adopted Justice Kennedy's more narrow approach to federal authority. As a result, this Court follows suit.

B.     Prior Converted Cropland Exemption

Corps regulations contain various exemptions to the CWA's prohibition on discharges into waters of the United States based upon the nature or use of the land. Specifically, Corps regulations specify that "prior converted cropland" is not a water of the United States and therefore the CWA discharge prohibitions do not apply to such land. 33 C.F.R. § 328.3(a)(8).  Upon the adoption of this regulation, the Corps clarified that "prior converted cropland" refers to wetlands that were manipulated for farming purposes before December 23, 1985. The exemption does not apply to areas where farming has been abandoned for five consecutive years and where wetland characteristics have returned. 58 Fed. Reg. 45008, 45034 (Aug. 25, 1993).

III.   PROCEDURAL BACKGROUND

Regulations promulgated by the Corps authorize a District Engineer to make a jurisdictional determination as to whether an area is a water of the United States and thus within the Corps' regulatory jurisdiction pursuant to the CWA. 33 C.F.R. §§ 320.1(a)(6), 325.9. Once a jurisdictional determination has been made by a District Engineer, there is a single level of administrative appeal to the Division Engineer. *Id.* § 331.3(a)(1). The appeal is initiated when an affected party submits a Request for Appeal, but the administrative appeal "is limited to the information contained in the administrative record by the date of the NAP [Notification of Appeal Process]." *Id.* §§ 331.6(a), 331.7(f).  The NAP is a fact sheet that accompanies the jurisdictional determination and that explains the administrative appeal

process. Neither party to the appeal may present new information, but either party may "interpret, clarify or explain issues and information contained in the record." *Id.* § 331.7(f).

If the Division Engineer determines that an appeal is without merit, his letter, which advises the applicant that the appeal is without merit and confirms the District Engineer's initial decision, becomes the final Corps decision. *Id.* § 331.10(a). If, however, the Division Engineer determines that the appeal has merit, he may remand the matter to the District Engineer with instructions to correct procedural errors or to "reconsider the decision where any essential part of the district engineer's decision was not supported by accurate or sufficient information, or analysis, in the administrative record." *Id.* § 331.9(b). In the case of remand, the District Engineer's decision, made pursuant to the remand from the Division Engineer, becomes the final Corps decision is *Id.* § 331.10(b).

A.    First Jurisdictional Determination

In this case, the Chicago District Engineer issued an initial jurisdictional determination on November 17, 2006, concluding that approximately 13 acres of wetlands on the Warmke Parcel are "waters of the United States" subject to regulation under the CWA. Record [30-5] at 19. Significant to the District Engineer's decision was the fact that the identified wetlands drain via a storm sewer pipe "to Midlothian Creek which is a tributary to the Little Calumet River, a navigable water." *Id.* G&H administratively appealed that decision to the Division Engineer, arguing that the November 2006 jurisdictional determination failed to

apply *Rapanos*. The Division Engineer agreed and remanded the jurisdictional determination to the District Engineer with instructions to reconsider its decision in light of *Rapanos*. *Id.* at 1-2.

B.     Second Jurisdictional Determination

The District Engineer issued a second approved jurisdictional determination in October 2010, applying *Rapanos* and concluding that jurisdictional waters encompass the Warmke Property because there is a significant nexus to the navigable Little Calumet River. Record [30-3] at 3-4. The District Engineer's decision was based upon a finding that the wetlands in question drained into Midlothian Creek, establishing a "physical hydrologic connection" to the navigable Little Calumet River. *Id.* at 3. This "significant nexus" enables "pollutants, floodwaters, nutrients and organic carbon to transport from the onsite wetland to the navigable water," significantly affecting "the chemical, physical and biological integrity of the Little Calumet River, a traditional navigable water." *Id.* G&H filed a second administrative appeal in January 2011, arguing that the District Engineer erred in finding a significant nexus and in concluding that the property was not exempt as prior converted cropland. Record [30-2] at 75-77. The Division Engineer determined that the second administrative appeal was without merit in June 2011. *Id.* at 67-74.

C.     Third Jurisdictional Determination and Final Remand

In July 2011, G&H asked the Corps to reconsider its previous appeal decision because of the 1993 prior converted cropland designation excluding the parcel from

CWA jurisdiction. *Id.* at 27-32. The Corps agreed to reconsider the decision and the District Engineer issued a third jurisdictional determination on March 26, 2012, affirming the prior decision. Record [30-1] at 75-77. Although the District Engineer recognized that the property had previously been used for agricultural activities, she determined that those activities had ceased by the fall of 1996, that the "wetland areas have not been farmed for 15 consecutive years and wetland conditions have returned." *Id.* at 76. G&H filed a third administrative appeal to the Division Engineer on May 24, 2012, arguing that the District Engineer's significant nexus determination was not supported by sufficient evidence. *Id.* at 64-73. The Division Engineer issued its review of the appeal on May 9, 2013, concluding that the appeal had merit "because the District [Engineer] failed to provide the requisite explanation for its significant nexus determination." *Id.* at 48. The Division Engineer remanded the appeal to the District Engineer with instructions "to include sufficient documentation to support its decision" and "to follow procedures set forth in the 2008 *Rapanos* Guidance." *Id.* at 48, 52.

Upon remand the District Engineer issued a new jurisdictional determination on July 19, 2013, again concluding that there is a significant nexus to the Little Calumet River, a traditional navigable water, placing the property within the protection of the CWA. *Id.* at 11. The District Engineer concluded that the relevant wetlands "drain via surface and subsurface connection to Midlothian creek, a perennial stream tributary to the navigable Little Calumet River," significantly affecting—alone and in combination with other wetlands in the area—the chemical,

physical and biological integrity of the river. Record [30-1] at 11. The District Engineer determined that this impact constitutes a significant nexus under *Rapanos*. In reaching this decision, the District Engineer provided additional "significant nexus documentation" in an eleven-page document titled "Warmke Site Wetland Functions and Benefits to Downstream Waters." Record [30-1] at 11, 36-46. This document had not previously been included in the administrative record.[2] *Id.* The July 19, 2013 jurisdictional determination constituted the final agency decision. 33 C.F.R. § 331.10(b).

### D. Current Proceedings

G&H brought suit in this Court challenging the Corps' jurisdictional determination over its property. Here, G&H claims that the Corps failed to follow its own regulations, disregarded the explicit instructions of the Division Engineer, and violated the Administrative Procedure Act when it "supplemented the record by adding 11 pages discussing approximately 30 extra-record studies, and concluding, based almost entirely on those studies, that a significant nexus existed between the 13 acres and the Little Calumet River." Plaintiff's Memorandum in Support of Summary Judgment [40] at 3. G&H also argues that the jurisdictional determination is invalid, even if there is a sufficient nexus, because the property falls within the prior converted cropland exception to the CWA. G&H claims that the jurisdictional determination subjects it to the risk of severe civil and criminal sanctions if it continues its development activities, rendering the entire

---

[2] G&H has moved to strike this document, *see* Doc. 32. The Court addresses the motion below.

undeveloped portion of the Warmke Parcel (consisting of approximately 65 acres) essentially unmarketable. *Id.* at 9. The parties filed cross motions for summary judgment, [40], [55], which the Court considers below.

IV.  APPLICABLE LEGAL STANDARDS

A court should grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The party seeking summary judgment has the burden of establishing that there is no genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). In determining whether a genuine issue of material fact exists, this Court must construe all facts and reasonable inferences in the light most favorable to the nonmoving party, here, each party with respect to the other's motion. *See CTL ex rel. Trebatoski v. Ashland School District*, 743 F.3d 524, 528 (7th Cir. 2014).

This Court's review of a final agency decision by the United States Army Corps of Engineers is governed by the Administrative Procedure Act ("APA").  This Court may reverse the Corps' decision under limited circumstances, such as where the decision is arbitrary and capricious or otherwise not in accordance with the law. 5 U.S.C. § 706(2).  The standard does not mean no review at all, but that the Corps' decision will "be accorded a high degree of deference." *Mt. Sinai Hospital Medical Center v. Shalala*, 196 F.3d 703, 708 (7th Cir. 1999).  The Court's review presumes

the validity of agency actions so long as they satisfy minimum standards of rationality in light of the administrative record. *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 416 (1971) ("[T]he court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment…. The court is not empowered to substitute its judgment for that of the agency.")

When judicial review involves determining the meaning of an agency regulation, the agency's interpretation of its own regulation is entitled to significant deference, unless that interpretation is "plainly erroneous or inconsistent with the regulation." *Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410, 413 (1945). If the agency's interpretation is not plainly erroneous or inconsistent with the regulation, that interpretation bears "controlling weight." *Id.* The agency is entitled to judicial deference even if its interpretation is advanced in a legal brief. *Chase Bank USA v. McCoy*, 562 U.S. 195, 208 (2011) ("[W]e defer to an agency's interpretation of its own regulation, advanced in a legal brief, unless that interpretation is plainly erroneous or inconsistent with the regulation.") (internal quotations omitted). The reviewing court need not agree with the agency's interpretation and must defer if that interpretation is reasonable. *Decker v. Northwest Envtl. Def. Ctr.*, 568 U.S. 597, 613 (2013) ("It is well established that an agency's interpretation need not be the only possible reading of a regulation—or even the best one—to prevail.").

V.    DISCUSSION

A.    The Administrative Record and Supplemental Information

Before turning to the merits of the parties' motions for summary judgment, the Court considers G&H's motion to strike eleven pages from the administrative record. *See* [32].  G&H argues that when the District Engineer relied upon eleven pages of studies that were not included in the administrative record at the time of the Notification of Appeal Process, the Corps violated: (1) its own regulations on administrative appeals; (2) the Division's remand order; and (3) the APA.

1.    The Corps' Regulations

G&H maintains that regulations promulgated by the Corps require that "the decision of the district on remand shall be based solely on the existing administrative record." [40] at 30. Because the District included additional information in the record on remand, G&H argues that it violated its own regulations.  The Corps disagrees, arguing that "if the division engineer remands the decision to the district engineer, the district engineer may further analyze and evaluate whatever issues are identified in the remand order...." [57] at 32. According to the Corps, "[t]his is precisely what happened here." *Id.* at 31.

An administrative appeal "is limited to the information contained in the administrative record" as of the date of the Notification of Appeal Process. 33 C.F.R. § 331.7(f). Once the administrative appeal is decided, however, the Division Engineer may instruct the District Engineer on remand to reconsider the decision where any part of it "was not supported by accurate or sufficient information, or

12

analysis, in the administrative record." *Id.* § 331.9(b). The Division Engineer may also instruct the District Engineer "to further analyze or evaluate specific issues." *Id.* § 331.10(b).

Given that the regulations specifically allow the Division Engineer to require the District Engineer to provide further analysis, it is reasonable to conclude that the limitation on supplementing the administrative record applies only to the Division Engineer on appeal and is not applicable to the District Engineer upon remand. Therefore, the Corps' interpretation of its regulations is reasonable and is entitled to this Court's deference. *See Chase Bank USA v. McCoy*, 562 U.S. 195, 208 (2011).

### 2. The Remand Order

G&H argues next that the supplemental information violated the explicit instructions of the Division Engineer in his remand order. The remand stated that "[t]he AR [administrative record] is limited to information contained in the record by March 29, 2012." [30-1] at 50. This statement, however, refers to the record reviewed during the administrative appeal itself. The plain context of the statement concerns the "information received during this appeal review and its disposition." *Id.* This reference constitutes a clear statement regarding the information the Division Engineer had considered during his review of the appeal, not an instruction prohibiting the District Engineer from supplementing the record during his further analysis upon remand.

This understanding remains consistent with the Corps' interpretation of the process required by its own regulations: the Division Engineer may not go beyond the administrative record when reviewing the District Engineer's decision on appeal, but it may instruct the District Engineer to provide further analysis on remand. That is exactly what occurred in this instance.

### 3. The Administrative Procedure Act

Finally, G&H argues that including the supplemental information was inconsistent with the APA. Judicial review of a final agency decision under the APA is based upon consideration of "the whole record or those parts of it cited by a party…." 5 U.S.C. § 706. The "whole record" consists of the record that was "before the agency" at the time of the final agency decision at issue. *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 420 (1971). The Corps' final agency decision here is "the district engineer's decision made pursuant to the division engineer's remand of the appealed action." 33 C.F.R. § 331.10(b). Here, that means the July 2013 jurisdictional determination issued by the District Engineer pursuant to the May 2013 remand from the Division Engineer. The supplemental information in dispute here was included in the administrative record and provided part of the basis for the July 2013 reviewable final agency decision, consistent with the APA.

For all of these reasons, the Court rejects G&H's arguments concerning the propriety of the eleven-page document and denies G&H's motion to strike.

B.      Significant Nexus

Having determined that the eleven-page document is properly part of the record on review, this Court turns to the merits of the case. At least in this Circuit, establishing CWA jurisdiction under *Rapanos* requires showing the "existence of a significant nexus between the wetlands in question and navigable waters in the traditional sense." 547 U.S. 715, 779 (2006) (Kennedy, J., concurring). A significant nexus exists "if the wetlands, either alone or in combination with similarly situated lands in the region, significantly affect the chemical, physical, and biological integrity of other covered waters more readily understood as 'navigable.'" *Id.* Conversely, no significant nexus exists (and consequently no jurisdiction may be established under the CWA) if the wetlands in question have only a "speculative or insubstantial" impact on traditional navigable waters. *Id.*

As previously noted, agency decisions are entitled to significant judicial deference, particularly when they involve scientific and technical determinations within that agency's field of expertise. *See Indiana v. EPA*, 796 F.3d 803, 811 (7th Cir. 2015). This case involves such determinations. The Corps' empirical scientific findings conclude that the thirteen acres of wetlands on the Warmke Parcel significantly affect the physical, chemical, and biological integrity of the Little Calumet River, and thus establish the requisite significant nexus to that traditional navigable water. *See* [30-1] at 11-46. Based upon the findings identified below, this conclusion is a reasonable one, it is neither speculative nor insubstantial, and it is entitled to the deference of this Court. Therefore, the Corps has established a

significant nexus between the Warmke Parcel and the Little Calumet River sufficient to assert jurisdiction under the CWA.

1.      Physical Impact

The Corps' findings conclude that the wetlands on the Warmke Parcel do significantly affect the physical integrity of the Little Calumet River because they considerably reduce peak flows, thereby helping prevent flooding downstream surrounding the River. The wetlands and dense vegetation on the Warmke Parcel provide "stormwater storage." *Id.* at 23. This water storage "function helps reduce the frequency and extent of downstream flooding and reduces downstream bank erosion and sedimentation in Midlothian Creek and the Little Calumet River." *Id.*

Concerns already exist concerning flooding problems in the Midlothian Creek watershed, particularly given the expectation of extensive urban development over the next decade and the corresponding increase of impervious surfaces. *Id.* at 38. Midlothian Creek is a major source of floodwaters to the navigable Little Calumet River, where flooding annually causes millions of dollars of damage. *Id.* The area has been identified by the Metropolitan Water Reclamation District of Greater Chicago as a priority for new flood-control projects because "[h]undreds of structures and multiple roadways in this watershed are threatened by flood waters on an annual basis." *Id.* The Corps itself is close to completing a $270 million flood control project on the Little Calumet River just over the Illinois border in Lake County, Indiana. *Id.*

In reaching its conclusion about the physical impact of the Warmke Parcel wetlands on the Little Calumet River, the Corps considered the "size, topography, roughness of the wetland surface, and location in the watershed." *Id.* Out of 165 wetlands in the watershed, the Warmke Parcel contains the fourth largest emergent wetland, which makes it one of the largest "flood storage and velocity reduction contributions to downstream waters." *Id.* Furthermore, the Corps noted that dense vegetation on the site and the slope of the topography increase the residence time of stormwater and reduces "the likelihood of flood and erosion damage downstream by detaining and slowly releasing storm flows." *Id.* at 39.

2.     Chemical Impact

The Corps also determined that the wetlands on the Warmke Parcel have a significant chemical impact on the traditionally navigable Little Calumet River because they filter, slow, and retain pollutants that would otherwise flow to the River. *Id.* at 40. Of particular concern here is the wetlands' capacity to reduce nitrogen pollution, which "has been associated with lower quality stream habitats in northeastern Illinois, including Midlothian Creek." *Id.* Wetlands have been identified as effective filters with the potential to remove seventy-seven percent of onsite nitrogen. *Id.* at 41. The Corps estimates that without the aggregated wetlands in the watershed, twenty-seven to fifty-one percent more nitrogen would "enter and adversely affect Midlothian Creek, which in turn would pollute the navigable Little Calumet River." *Id.* The Warmke Parcel has been identified as

particularly crucial to the water quality of navigable waters because there are no other wetlands located between it and the Midlothian Creek.

### 3. Biological Impact

Finally, the Corps concluded that the wetlands significantly affect the biological integrity of traditionally navigable waters because the aggregation of wetlands in the Midlothian Creek watershed "has a significant effect on wildlife within the watershed and wildlife located downstream in the Little Calumet River." *Id.* at 42. This conclusion is based upon the finding that numerous species of fish and wildlife utilize the Warmke Parcel, Midlothian Creek, and the Little Calumet River for different phases of their lifecycle. Thus, disturbing wetlands on the Warmke Parcel would affect wildlife in the navigable Little Calumet River by removing a portion of their upstream habitat. *Id.* at 43.

Because the Warmke Parcel wetlands "alone or in combination with similarly situated lands in the region, significantly affect the chemical, physical, and biological integrity of other covered waters more readily understood as 'navigable,'" the Corps' "significant nexus" determination and attendant assertion of jurisdiction were reasonable.

### C. Prior Converted Cropland Exemption

G&H also argues that its property does not fall within the regulatory jurisdiction of the CWA—even if a significant nexus is established under *Rapanos*—because it is exempted as prior converted cropland.

The Corps does not dispute that the property in question was "converted from wetland to agricultural use before December 23, 1985, and for that reason would likely be considered PC [prior converted] cropland…." Record [30-1] at 13. But the Corps determined that the prior converted cropland exemption does not apply where agricultural activities have been abandoned, as they were here. *Id.* G&H argues that the abandonment limitation does not apply; it also argues that agricultural activities were not abandoned for purposes of this limitation.

1.     Regulatory Overview

An understanding of the development of regulatory overlap between different agencies is necessary to understand the arguments surrounding the prior converted cropland issue. Three federal agencies regulate wetlands: (1) the Corps; (2) the Environmental Protection Agency ("EPA"); and (3) the National Resources Conservation Service ("NRCS"), formerly known as the Soil Conservation Service ("SCS") and part of the United States Department of Agriculture ("USDA"). The Corps determines whether particular property contains regulatory wetlands under the CWA and issues permits allowing permittees to discharge dredged or fill materials into such property. 33 C.F.R. §320.1(a)(6). The EPA aids the Corps by providing criteria to evaluate permit applications and has joint authority with the Corps to enforce the CWA. 33 U.S.C. § 1344(b). Finally, the NRCS has authority to determine whether wetlands exist on a given property for the purpose of federal agricultural financial benefits under the "Swampbuster" provisions of the Food Security Act. 16 U.S.C. § 3821.

The Food Security Act's Swampbuster program was adopted to discourage farmers from converting wetlands into farming operations. It does so by denying eligibility for federal farm program benefits when wetlands are used for farming. 16 U.S.C. § 3821(a). Exempt from such penalties, however, are "prior converted croplands"—wetlands that were converted to agricultural use prior to December 23, 1985. 16 U.S.C. §3822; 7 C.F.R. § 12.2(a)(8). The NRCS regulations limited the prior converted cropland exemption, however, by incorporating an abandonment provision. Under this limitation, prior converted cropland loses its exemption if abandoned. The regulations define abandonment as "the cessation for five consecutive years of management or maintenance operations related to the use of a farmed wetland or farmed-wetland pasture." 7 C.F.R. § 12.33(c).

Because of differing standards among the three agencies, farmers often found it difficult to comply with all three sets of regulations. Thus in 1993, in an effort to provide consistency between the three agencies, the Corps and EPA jointly adopted a rule implementing the NRCS's prior converted cropland exemption for purposes of the CWA. 33 C.F.R. § 328.3(b)(2). This general regulation, however, contained no specific reference to the relevant abandonment limitation recognized by the NRCS, and the Corps and EPA never expressly published the abandonment limitation within the Code of Federal Regulations. Nevertheless, the Corps and EPA did explain in the Federal Register itself that they will "use the [NRCS] provisions on 'abandonment,' thereby ensuring that PC [prior converted] cropland that is abandoned within the meaning of those provisions and which exhibit wetlands

characteristics will be considered wetlands subject to [CWA] regulation." 58 Fed. Reg. 45008, 45034 (Aug. 25, 1993). The purpose of this regulatory decision was to provide uniformity between the agencies and "a mechanism for 'recapturing' into [CWA] jurisdiction those PC croplands that revert back to wetlands where the PC cropland has been abandoned." *Id.* The definition of abandonment for purposes of the CWA is, therefore, specifically contained within the definition set forth by the NRCS.

In *Huntress v. U.S. Dep't of Justice*, No. 12-CV-1146S, 2013 WL 2297076, at *10 (W.D.N.Y. May 24, 2013), the court was asked to determine, among other issues, whether the CWA's exemption of "prior-converted croplands" included the abandonment provision. The court held that it did:

> Lands that qualify as prior-converted croplands, or wetlands converted to farming prior to December 23, 1985, are categorically excluded from the definition of "waters of the United States" and are therefore beyond the jurisdiction of the CWA. 40 C.F.R. § 230.3(s), 33 C.F.R. § 328.3(a)(8); see 7 C.F.R. § 12.2. . . . But the implementing regulations also provide that such a designation can be lost if the land is not used for farming purposes for five consecutive years. As explained in the relevant Federal Register preamble, the EPA and Corps excluded prior-converted croplands "to ensure consistency in the way various federal agencies are regulating wetlands." 58 Fed.Reg. 45008, 45034 (August 25, 1993). In this vein, the agencies used the abandonment provisions set out by the Soil Conservation Service—an arm of the United States Department of Agriculture ("USDA") that is now called the National Resources Conservation Service—and applied them to the CWA. Id. Specifically, the Register provides:
>
> > The Corps and EPA will use the S[oil] C[onservation] S[ervice] provisions on "abandonment," thereby ensuring that P[rior] C[onverted] cropland that is abandoned within the meaning of those provisions and which exhibit wetlands characteristics will be considered wetlands subject to Section 404 regulation.... In particular, P[rior]

21

> C[onverted] cropland which now meets wetland criteria is
> considered to be abandoned unless: For once in every five
> years the area has been used for the production of an
> agricultural commodity, or the area has been used and
> will continue to be used for the production of an
> agricultural commodity in a commonly used rotation with
> aquaculture, grasses, legumes or pasture production.

*Huntress,* 2013 WL 2297076, at *10 (quoting 58 Fed.Reg. 45008, 45034 (August 25,

1993)). The court concluded that "under both the National Resources Conservation

Service's and the EPA's regulations, when land has been abandoned for a

continuous five-year period, . . . it loses any prior exemption from the CWA that it

may have once had." *Id.* at *11.

Although not binding, this Court finds that the reasoning in *Huntress* is

sound, and therefore agrees that the regulations must be read within context. Here,

properly reading the preamble and the regulation together, the regulatory language

confirms that the prior converted cropland exemption may be lost if agricultural

activities are abandoned. Indeed, Plaintiff could provide no contrary authority to

support its argument that the CWA incorporated the Food Security Act's prior

converted cropland exemption but without any abandonment provision. Besides

*Huntress,* the only other case to consider the issue came out the same way. *See*

*United States v. Righter*, No. 1:08-CV-0670, 2010 WL 2640189, at *2 & n.4. (M.D.

Pa. June 30, 2010) (defining "prior converted cropland" to include the abandonment

provision because, according to "agency rule, '[t]he Corps and EPA will use the SCS

provisions on 'abandonment,'" citing the preamble). Accordingly, the Court rejects

G&H's argument that under the CWA, prior converted cropland, once designated, may not lose that designation through abandonment.

2. Abandonment Analysis

The record here establishes that the specific thirteen-acre portion of the Warmke Parcel in question has not been farmed since 1996, and that wetland conditions have returned. Record [30-1] at 90. Indeed, there is no evidence that agricultural activities continued on that property after that date. As a result, the abandonment requirement is satisfied. 7 C.F.R. § 12.33(c). G&H argues, however, that the prior converted cropland in question is not abandoned because "major portions of the Warmke Parcel continue to be farmed." [40] at 20. Specifically, G&H argues that abandonment has not occurred because farming elsewhere on the one-hundred-acre parcel (where the Corps has never attempted to assert jurisdiction) preserves the prior converted cropland status of the thirteen acres of wetlands. This Court disagrees.

The abandonment rule is directed toward wetlands individually. It does not consider or effect activities on adjacent property. The documented purpose for adopting the abandonment rule was to bring within CWA jurisdiction prior converted croplands "that revert back to wetlands where the PC cropland has been abandoned." 58 Fed. Reg. 45008, 45034 (Aug. 25, 1993). Such is the case here. The Corps has not attempted to argue abandonment or assert jurisdiction over other portions of the property that continue to be farmed. Instead, it asserts jurisdiction only over a thirteen-acre portion of the property where farming activities have

ceased for considerably more than five years and where wetland conditions have returned.

### 3. Artificial Wetlands and Conversion under 7 C.F.R. § 12.5(b)(1)

G&H makes two other arguments in opposition to federal jurisdiction. First, G&H argues that the Corps' assertion of jurisdiction is improper because the thirteen acres are "artificial wetlands" under 7 C.F.R. § 12.2(a). An "artificial wetland" is a "wetland that is temporarily or incidentally created as a result of adjacent development activity"; unlike true wetlands, artificial wetlands do not lose their prior converted cropland status even if farming is abandoned. *Id.* §§ 12.2(a), 12.5(b)(1)(vii). G&H argues its property is an artificial wetland because the wetland conditions on the thirteen acres were caused solely by a damaged drainage tile associated with construction on the property, which caused water pooling at the site. [40] at 21.

G&H also argues that the Swampbuster abandonment provision does not apply if the property has been converted to "a purpose that does not make the production of an agricultural commodity possible, such as . . . building and road construction. . . ." [40] at 20; 7 C.F.R. § 12.5(b)(1)(iv). This conversion provision applies to the property here, G&H argues, because it "was converted to a purpose inconsistent with the production of an agricultural commodity when it was graded and clay was compacted for housing construction," making farming impossible. [40] at 20-21.

As a threshold matter, the Corps responds that G&H waived this latter argument about the exemptions in §§ 12.5(b)(1) by failing to raise it in any of its administrative appeals.  It is well established, however, that "[o]nce a federal claim is properly presented, a party can make any argument in support of that claim; parties are not limited to the precise arguments they made below." *Yee v. City of Escondido*, 503 U.S. 519, 534 (1992).  Although G&H may not have raised this particular argument during its administrative proceedings, it repeatedly argued that the property did not lose its prior converted cropland status.  Therefore, G&H did not waive any arguments in support of that claim, including the § 12.5(b)(1) exemption claims. Accordingly, this Court will address the merits of G&H's arguments.

First, the structure of § 12.5(b) indicates that the prior converted cropland exemption is distinct from the artificial wetland and building conversion provisions. G&H treats all three provisions as applicable to the Corps' ability to exert jurisdiction over its property, but fails to note that the three provisions are substantively and structurally distinct. Each is one of seven independent limitations concerning when a person "shall not be determined ineligible for [farm] program benefits" under the Food Security Act.  When it adopted the prior converted cropland exemption and the related abandonment provisions in 1993, the Corps did not adopt the artificial wetland and building conversion provisions.  In fact, those provisions were the result of later amendments made in 1996; fully three years after the Corps adopted the NRCS definitions.  As such, it does not follow

automatically that because in one instance the Corps adopted NRCS's prior converted cropland exclusion that it, therefore, adopted lock-step inclusion of all future provisions subsequently issued by the NRCS relating to how farmland might be used without losing farm program benefits. G&H treats these separate provisions as synonymous with the prior converted cropland provisions, but they are not synonymous.

Second, even if the artificial wetland and building conversion provisions were relevant to G&H's prior converted cropland abandonment issue, the applicability of both of those provisions must be based upon a predicate determination by NRCS. No such determination, however, occurred here. The NRCS never issued a determination that the thirteen acres are artificial wetlands or that they had been converted for a building purpose that made farming impossible. In response, G&H simply maintains that the necessity of a prior determination from NRCS, as the text requires, is "nonsensical" because NRCS only makes such findings for farmers in consideration of farm subsidies, not residential developers such as G&H. Doc. 61 at 14-15. But this plain language interpretation of the regulation is only "nonsensical" because G&H seeks to misapply these provisions in the context of the CWA, which never adopted or incorporated them.

G&H's statutory construction arguments are internally inconsistent. On the one hand, G&H argues that if the Corps elected to adopt provisions from the Food Security Act, it must adopt them in their entirety for all time (i.e., if you adopt the Prior Converted Cropland exemption, you must also adopt the subsequent artificial

wetlands and building and construction exemptions).  On the other hand, it is also arguing that, even though the CWA incorporates the artificial wetlands and building and construction exemptions, it does not incorporate the specific prerequisites for those exemptions (e.g., the express foundational determinations by the NRCS).  G&H cannot have it both ways.

Fundamentally, simply because the EPA adopted one exemption from the Food Security Act does not mean that all exemptions apply.  Indeed, as the court in *Huntress* noted, "the regulations implementing the CWA recognize this and caution that, although the EPA fashioned a rule identical to that of the USDA, the EPA retains 'ultimate statutory responsibility for determining the scope of CWA jurisdiction.'" *Huntress*, 2013 WL 2297076, at *12 (quoting 58 Fed.Reg. 45008–01, 45033); *see also*, 33 C.F.R. § 328.3(a)(8) ("[F]or the purposes of the Clean Water Act, the final authority regarding Clean Water Act jurisdiction remains with EPA.").

Thus, based upon the reasons discussed above, the thirteen acres of wetlands on the Warmke Parcel do not qualify for the prior converted cropland exemption. Furthermore, the artificial wetlands and building conversion exemptions outlined in 7 C.F.R. § 12.5(b)(1) do not apply here because those exemptions are not relevant to jurisdictional determinations under the CWA.

## CONCLUSION

For the reasons stated herein, this Court denies Plaintiff's motion to strike [32], denies Plaintiff's motion for summary judgment [40], and grants Defendant's

cross motion for summary judgment [55].  The Clerk is directed to enter judgment in favor of Defendant and against Plaintiff.

Dated:  September 19, 2017

ENTERED:

John Robert Blakey
United States District Judge